# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Jason Johnston,

               Plaintiff,

v.

BNSF Railway Company,

               Defendant.

Civ. No. 15-3685 (RHK/SER)
**MEMORANDUM OPINION
AND ORDER**

---

Jon M. Moyers, Moyers Law, PC, Billings, Montana, Kathryn Kohn Troldahl, Kohn Law, PA, Minneapolis, Minnesota, for Plaintiff.

Timothy R. Thornton, Tara Reese Duginske, Briggs and Morgan, PA, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

Plaintiff Jason Johnston alleges in this action that the negligence of his former employer, Defendant BNSF Railway Company ("BNSF"), caused him injuries, in violation of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*., and that BNSF terminated him in retaliation for making safety and personal-injury reports, in violation of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109.  Presently before the Court are the parties' cross-Motions for Partial Summary Judgment.  For the reasons that follow, the Court will grant BNSF's Motion and grant in part and deny in part Johnston's Motion.

# BACKGROUND

The following facts are undisputed. BNSF operates a railroad spanning 33,000 miles, twenty-eight states, and two Canadian provinces. (Mclaughlin Decl. ¶ 2.) Its Maintenance of Way ("MOW") Department preserves the integrity of its railroad tracks and related structures. (Id. ¶ 4.) Johnston began working for BNSF in 1997 and, at all relevant times, worked in its MOW Department as a track inspector. His duties included investigating reports of track-related defects in BNSF's Appleton Subdivision, part of the Twin Cities South Division. He inspected tracks using a BNSF-owned "hyrail" truck capable of driving on and off railroad tracks.

## I.      BNSF policies

Several relevant policies governed Johnston's workplace conduct. First, like most BNSF employees, Johnston belonged to a union, the Brotherhood of Maintenance of Way Employees ("BMWE"). A collective bargaining agreement ("CBA") between BNSF and BMWE set forth workplace rules and required BNSF to follow certain procedures prior to disciplining a union employee. (See Duginske Decl. Ex. Q.) It also provided that "[n]o overtime hours will be worked without authority of a superior officer, except in cases of emergency where advance authority is not obtainable." (Id.)

Second, BNSF's Policy for Employee Performance Accountability ("PEPA") provided that "[r]ule compliance is essential to a safe operation, and [BNSF] expect[s] everyone . . . to consistently comply with [its] safety and operating rules." (Id. Ex. R at 2.) It set forth three categories of misconduct—standard, serious ("Level S"), and "stand-alone dismissible" violations—and outlined a progression of discipline for repeat

violations in each category.  (Id. at 3–4.)  A standard violation is one "which does not

subject an employee or others to potentially serious injury or fatality," whereas a Level S

violation includes, among other things, any "[v]iolation of any work procedure that is

designed to protect employees, the public and/or others from potentially serious" injury

or fatality.  (Id. at 5.)  Stand-alone dismissible violations, as the label suggests, may

"result in immediate dismissal."  (Id. at 6.)  "Dishonesty about any job-related subject" is

one such stand-alone dismissible violation.  (Id.)

Finally, BNSF promulgated Maintenance of Way Operating Rules ("MWOR") for

track inspectors such as Johnston.  (See id. Ex. Z.)  The MWOR required Johnston to

obtain pre-approval from central train dispatch prior to occupying railroad tracks

("fouling the tracks") to ensure it was safe for him to do so.  The "lone worker rule" is an

exception—a lone worker may foul the tracks absent preapproval when, among other

things, the "lone worker is able to visually detect the approach of a train . . . and position

themselves [sic] in a predetermined place of safety at least 15 seconds prior to the arrival

of the train."  (Id. at 7.)

## II.      Events giving rise to this case

### A.      Safety ladder complaint

On October 12, 2012, track inspector Timothy Even lodged a safety complaint

with BNSF regarding his hyrail truck.  (Kohn Aff. Ex. D.)  Specifically, he reported that

its tailgate was forty-eight inches off the ground when parked on railroad tracks.  At this

height, in his view, he lacked a safe method of entering and exiting the rear of the truck.

(Id.)  Though Johnston's hyrail truck was not identified in Even's report, Johnston

recalled raising the same issue at "numerous safety meetings" during the fall of 2012. (Johnston Dep. 10–11.)  He complained to his direct supervisor, Roadmaster Larry Sanders, that BNSF needed to install safety ladders on hyrail trucks to remedy the issue. (Id.)  Sanders obtained one ladder, directed Even to install it on his truck, and considered the complaint resolved.  (Sanders Dep. 74.)  Then, "some of the guys [saw] the steps that came in and asked if they could get one," so Sanders "went ahead and just ordered [them] all steps."  (Id. 76; see also Kohn Aff. Ex. I (ladder receipts dated late 2012 and early 2013).)  Sanders testified in his deposition that, when the ladders arrived, he directed Johnston to "come and pick [a ladder] up and get it installed."  (Sanders Dep. 83.)  In contrast, Johnston testified that no one advised him a ladder was available or approved its installation on his truck.  (Johnston Dep. 16, 113–14.)  It is undisputed, however, that Johnston never had a ladder installed on his truck.

## B.     Johnston's probation

On March 13, 2013, BNSF cited Johnston for failing to wear his seatbelt while operating his hyrail truck, a Level S violation.  (Duginske Decl. Ex. Y.)  Johnston took responsibility for the violation and waived his CBA-afforded right to a hearing.  (Id.)  As a consequence, in April 2013, he incurred a "30 Day Record Suspension" and one year of probation, as contemplated by the PEPA.  (Id.; see also id. Ex. R; Johnston Dep. 21.) Under such circumstances, the PEPA warned that "[a] second [Level S] violation committed within the applicable review period may result in dismissal."  (Duginske Decl. Ex. R at 4.)

## C.    Federal Railroad Administration complaint

Two months later, on May 14, the BMWE lodged a complaint against BNSF with the Federal Railroad Administration ("FRA") based on safety concerns reported by Johnston.  (Id. Ex. VV.)  Johnston had approached BMWE Vice Chairman John Mozinski with concerns that Sanders was clearing track defects from BNSF's database when they had not in fact been remedied.  (Mozinski Dep. 18.)  Based on information Johnston provided (but without mentioning Johnston), Mozinski wrote a letter to the FRA outlining the concerns.  (Id.; Duginske Decl. Ex. VV.)  It prompted an investigation, which found:

> [BNSF's] inspection records were in order according to [federal standards].
> However, three locations inspected contained defects that had been
> documented as repaired which had not been remedied.  As a result, a
> recommendation for the assessment of civil penalties will be submitted to
> the FRA Office of Chief Counsel.

(Duginske Decl. Ex. WW.)  It is unclear whether BNSF incurred civil penalties (compare Johnston Dep. 37–38 (testifying that BNSF was fined), with Sanders Dep. 56 (denying fines were assessed)), but BNSF verbally reprimanded Sanders and noted "needs improvement" on his performance review because of the FRA's findings (T. Smith Dep. 131–32).

The FRA later performed a follow-up inspection and identified additional track defects at BNSF's Milbank yard (a location in Johnston's territory).  The FRA required BNSF to repair the defects within thirty days.  (Johnston Dep. 89, 95.)  Johnston e-mailed Sanders daily to remind him of the defects but, thirty days later, no one had completed the repairs.  (Id. 96.)  As a result, Johnston decided to "pull the yard out of service" on

July 19.[1]  (Id.)  Johnston testified in his deposition that Roadmaster Joshua Fluck (who was supervising him at the time) called and said his "ass would be grass" after he made this decision.  (Id. 36.)

### D.    Johnston's purported misconduct and verbal injury report

In the morning on August 5, 2013, the MOW Department called Fluck (who was again supervising Johnston) with a report of "rough tracks."  (Fluck Dep. 55–59.)  Fluck sent Johnston to the location to inspect the tracks and take any necessary safety precautions.  (Id. 59; Johnston Dep. 115.)  Johnston responded to the location, took measurements, and "slow ordered" the tracks to ten miles per hour.  (Duginske Decl. Ex. AA.)  After completing this work, he proceeded to inspect other tracks in his territory and reported these hours as overtime.  (Id. Ex. GG at 10, 14.)

Later that morning, Fluck participated in a conference call with Division Engineer Tom Smith and Sanders (who had returned).  Fluck informed Smith and Sanders of the rough-track call and Johnston's response.  (T. Smith Dep. 42–43.)  Smith asked Fluck whether Johnston had completed "track notes," a form upon which train inspectors document track measurements.  (Id.)  According to Smith, "Johnston knew . . . that was an expectation and a requirement," but it was "quite a while before" he received Johnston's track notes for the morning of August 5.  (Id. 45–46.)

While investigating whether Johnston had turned in his track notes, Fluck found no record of Johnston obtaining preapproval to "foul the tracks" at the location of the rough-track report.  (Id. 46.)  This led Smith to conclude that the section of rough tracks

[1] The parties' memoranda are unclear what it means to "pull a yard out of service."

either "wasn't inspected or . . . wasn't inspected . . . safely." (Id.) He decided to initiate an investigation as provided by the CBA. (Id. 54.) He drafted a letter informing Johnston of the investigation to determine whether he had "fail[ed] to properly obtain authority before occupying or fouling the main track when [he] responded to a rough track service interruption . . . on August 5, 2013." (Duginske Decl. Ex. BB.) The letter also stated that Johnston was "being withheld from service pending results of investigation." (Id.) Smith directed Sanders to hand-deliver this letter to Johnston at his home. (T. Smith Dep. 60.)

On August 7, Johnston engaged in strenuous work for the railroad. (Johnston Dep. 72.) BNSF assigned a team of track inspectors to repair some thirty-two track defects, and he repaired twenty-four on his own. (See Kohn Aff. Ex. C.) The following morning, he woke with severe back pain, which he attributed to his work the previous day. (Johnston Dep. 73–75.) Then, around 7:00 a.m., Johnston was leaving his home when Sanders and another BNSF employee arrived. (Id.) Sanders handed Johnston an envelope containing Smith's notice of investigation and said, "We're pulling you out of service." (Id.) Johnston testified in his deposition that he "could not believe it" and was "beside [him]self." (Id.) For "several minutes," he blocked everything out. (Id. 76.) He then reported a workplace injury to Sanders: "I told them . . . well, that's fine . . . but we need to do some paperwork, because . . . I cannot hardly walk, I can't move, I can't tie

my shoes, I have to go see the doctor." (Id.)  According to Johnston, Sanders ignored this report and drove away.[2] (Id.)

## E.     Additional violations charged

After commencing the first investigation, Smith continued to review Johnston's August 5 conduct.  (T. Smith Dep. 53.)  In doing so, he learned of two more potential rule violations:  first, following the rough-track call, Johnston continued to work and reported those hours as overtime when, according to BNSF, he did not have supervisor approval to do so.  Second, Johnston reported that he had traversed another section of track by hyrail truck, but there was no record of him obtaining preapproval to foul the tracks.  (Id. 50, 53–54.)  Smith decided to initiate an investigation into these violations as well, and he so notified Johnston by two letters dated August 13.  (Duginske Decl. Exs. II, JJ.)  The letters stated that "BNSF received first knowledge of [these] alleged violation[s] [on] August 8, 2013."  (Id.)

Later that month, BNSF held three hearings centered on Johnston's purported rule violations, at which he offered explanations for his conduct.  With respect to the first alleged fouling-the-tracks violation, he acknowledged that he lacked preapproval to foul the tracks.  (Duginske Decl. Ex. FF at 24–26, 31.)  He explained that he followed the "lone worker rule" to protect himself from oncoming trains.  (Id.)  But because it was dark outside at the time, BNSF concluded that Johnston lacked a sufficient view of

---

[2] Sanders and the BNSF employee accompanying him reported that Johnston swore at them and said, "[I]f that is the way you want to play it[,] I hurt my back shoveling[] yesterday and I am hurting, where you want to go and write it up."  (Second Duginske Decl. Ex. 2; see also id. Ex. 1.)  Both also reported that *Johnston* drove away, not Sanders.

oncoming trains to rely on the lone-worker rule.  With respect to overtime hours, he

stated that he had told Fluck on August 5 "it was going to be a long night," and that he

"was not told [he] could not work."  (Id. Ex. GG at 34, 39.)  Finally, with respect to the

second alleged fouling-the-tracks violation, he stated that he needed no preapproval to

travel by hyrail truck because he had in fact walked the tracks.  (Duginske Decl. Ex. HH

at 26.)  BNSF then confronted him with his track-inspection form, where he had reported

that he traveled by hyrail truck.  (Id. at 33.)  Johnston responded that he simply erred in

completing the form.  (Id. at 34.)

Based on the documents and testimony presented at these hearings, Smith

concluded that Johnston had committed each rule violation charged, and he decided that

BNSF should terminate Johnston's employment.  (T. Smith Dep. 56.)  He passed this

recommendation to Douglas Jensen, the General Director of Line Maintenance for the

Twin Cities Division, and, after reviewing hearing documents, Jensen concurred.  (Id.;

Jensen Dep. 143, 168.)

BNSF then forwarded the recommendation to Andrea Smith, a Labor Relations

employee at its headquarters in Fort Worth, Texas.  Her role is to review dismissal

recommendations for consistency and compliance with the PEPA.  (A. Smith Dep. 7.)

She had no prior knowledge of Johnston and played no role in any aspect of his safety or

personal-injury reports.  (Id. 8, 31.)  She reviewed the evidence submitted, including

transcripts of the hearings, and noted that Johnston was on probation when he committed

the alleged rule violations.  (Id. 38–39, 89–90.)  Based upon her review, she concluded

the circumstances justified Johnston's discharge.  She outlined her findings in an e-mail

to Tom Smith and Jensen: "After reviewing the transcript, I support dismissal based on a second Level S PEPA [violation]." (Duginske Decl. Ex. PP.) In her view, each of Johnston's three violations independently supported dismissal. (Id.) Notably, with respect to Johnston's defense that he simply erred in recording his method of travel, she observed that "his own inspection report shows he [hyrailed]—he did not indicate he walked on the report. Therefore, if his defense were true, he would have falsified the document," which also would have justified his discharge. (Id.)

### F.    Johnston's written injury report and termination

On September 7, Johnston filed an "Employee Personal Injury Report" with BNSF. (First Kohn Aff. Ex. G.) His report described "severe low back pain and leg pain extending to the right foot and groin area" and stated that the injury occurred on August 7 as he was "getting in and out of the back of the hyrail truck." (Id.) He further reported that he had "no safe method of getting in and out of the back of the hyrail truck . . . when the truck is on the track." (Id.) Five days later, BNSF informed Johnston by three separate letters that he was "dismissed effective immediately from employment with BNSF" for the three rule violations discussed above. (Dugsinke Decl. Ex. QQ.)

On January 30, 2014, Johnston filed a complaint with the Occupational Safety and Health Administration ("OSHA"), alleging BNSF had retaliated against him. (Id. Ex. XX.) After 210 days, OSHA authorized his filing of a civil action. (Id. Ex. YY.) He commenced this action on September 18, 2015, alleging that BNSF (1) violated FELA by negligently failing to equip his truck with a safety ladder, and (2) violated FRSA by terminating him in retaliation for his personal-injury and safety-related reports. With

discovery complete, both parties have now moved for partial summary judgment. The Motions have been fully briefed and are ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Johnson v. Wheeling Mach. Prods., 779 F.3d 514, 517 (8th Cir. 2015). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Ryan v. Armstrong, 850 F.3d 419, 424 (8th Cir. 2017); Letterman v. Does, 789 F.3d 856, 858, 861 (8th Cir. 2015). The nonmoving party may not rest on allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Nationwide Prop. & Cas. Ins. Co. v. Faircloth, 845 F.3d 378, 382 (8th Cir. 2016).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering Johnston's Motion, the Court views the record in the light most favorable to BNSF, and, when considering BNSF's Motion, the Court views the record in the light most favorable to Johnston. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011).

## ANALYSIS

As noted, each Motion before the Court is partial: BNSF moves for summary judgment on Johnston's FRSA claim or, alternatively, for bifurcation of his claims, while Johnston moves (i) for summary judgment on the causation element of his FELA claim, and (ii) to preclude BNSF from offering at trial the affirmative defenses of contributory negligence and apportionment of damages.

## I.      BNSF's Motion

Johnston alleges that BNSF terminated his employment in violation of the FRSA, which provides, in pertinent part, that a railroad "may not discharge . . . or in any other way discriminate against an employee if such discrimination is due, in whole or in part," to the employee taking certain protected activities.  49 U.S.C. § 20109(a).  Those activities include reporting safety-related violations of federal law to a governing agency and reporting a work-related injury to a railroad.  Id.  In the absence of direct evidence of retaliation, Johnston may establish a prima facie case by demonstrating a genuine issue whether:

> (i) he engaged in a protected activity; (ii) BNSF knew . . . that he engaged in the protected activity; (iii) he suffered an adverse [employment] action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action.

Kuduk v. BNSF Ry. Co., 768 F.3d 786, 789 (8th Cir. 2014).  If he does so, BNSF may avoid liability only if it shows, "by clear and convincing evidence, that [it] would have taken the same unfavorable personnel action in the absence of" Johnston's protected activity.  Id.

Here, Johnston argues (and BNSF does not dispute) that his report to the BMWE/FRA regarding Sanders and his personal-injury report were protected activities. However, BNSF argues that Johnston has failed to show a genuine issue whether these activities contributed to its decision to terminate his employment. The Court agrees.

A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Id. (citation omitted). Johnston may meet his burden on this element by presenting circumstantial evidence of retaliation in the form of "a temporal proximity, pretext, shifting explanations by [BNSF], antagonism or hostility toward [his] protected activity, the falsity of [BNSF's] explanation[,] or a change in [BNSF's] attitude toward [him] after [he] engaged in protected activity." Kuduk v. BNSF Ry. Co., 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013) (Davis, C.J.), aff'd, 768 F.3d 786 (8th Cir. 2014). He may also rely on the "cat's paw" theory. "In a cat's paw case, an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action." Bennett v. Riceland Foods, Inc., 721 F.3d 546, 551 (8th Cir. 2013) (citing Staub v. Proctor Hosp., 562 U.S. 411 (2011)); see also Kuduk, 768 F.3d at 790–91.

Here, Johnston offers a litany of arguments to support his contention that his protected activities contributed to his termination. He first argues that Fluck, acting as a "cat's paw," caused BNSF to investigate him, discover his misconduct, and ultimately

discharge him. However, even assuming Fluck harbored retaliatory animus,[3] Johnston has failed to show that Fluck acted on it. There is no genuine issue that Tom Smith initiated the investigation into Johnston's conduct, not Fluck.[4] (T. Smith Dep. 42–43.) Smith testified in his deposition that *he directed* Fluck to review BNSF records and determine whether Johnston obtained the requisite authority to foul the tracks. (Id. 40–41, 54 ("I had [Fluck] do the follow-up . . . I told him to research it.").) Finally, Tom Smith—not Fluck—decided to initiate the formal investigation process. (Id. 54 ("It was my decision to hold an investigation.").) When asked about Fluck's involvement, Smith testified as follows:

> Q: [I]n your discussion with [Fluck], was he on board or give his input about bringing charges against [Johnston] for the alleged rule violations?
>
> A: Well, that was—never technically discussed that with [Fluck]. It was 'Here's what I need to know. Did you find me the facts?' Then I made all the decisions after that.

(Id. 55.) Indeed, aside from Fluck's stray remark about Johnston's "ass be[ing] grass" (a comment he denies (Fluck Dep. 123)), Johnston cites no evidence of an action taken by Fluck that led to his termination, and he nowhere argues or cites evidence that Tom Smith

---

[3] As evidence of discriminatory animus, Johnston relies on his deposition testimony that Fluck told him, "if [he] didn't return the [Milbank yard] back into order[,] that [his] ass would be grass." (Johnston Dep. 36.) The Court harbors doubt whether this comment alone, made two months prior to Johnston's discharge, is probative of retaliatory animus. E.g., Wells v. SCI Mgmt., L.P., 469 F.3d 697, 702 (8th Cir. 2006) (statements "made by nondecisionmakers and . . . unrelated to the decisional process itself" are immaterial).

[4] Johnston asserts that Fluck "pulled the authority reports on his own." (Mem. in Opp'n 29.) However, he cites no evidence supporting this assertion, and unsupported assertions are insufficient to defeat a motion for summary judgment. O'Brien v. Dep't of Agric., 532 F.3d 805, 811 n.3 (8th Cir. 2008) (citing Anda v. Wickes Furniture Co., 517 F.3d 526, 531 (8th Cir. 2008)).

harbored animus against him.  The fact that Fluck followed Smith's instruction to investigate Johnston does not raise an inference that Fluck's purported *animus* motivated him to do so.  It is surely the rare case in which a supervisor's investigation of a subordinate's compliance with established workplace rules evidences retaliation, particularly where, as here, safety (and thus rule compliance) is paramount.  Under these circumstances, no reasonable jury could conclude Fluck's investigation of Johnston was "motivated by[] animus [or] . . . intended . . . to cause an adverse employment action." Staub, 562 U.S. at 422.

Johnston also argues that "management's decision to charge [him] with two additional violations" on August 13, "so close in time with [his] reports . . . is circumstantial evidence of retaliation."  (Mem. in Opp'n 31.)  The first protected activity Johnston identifies—his report to the BWME/FRA regarding Sanders—occurred on May 14, three months before he received investigation notices on August 13.  A three-month gap between a protected activity and an adverse employment action is too long to suggest retaliation.  E.g., Sisk v. Picture People, Inc., 669 F.3d 896, 901 (8th Cir. 2012) ("More than two months is too long to support of finding of causation without something more."); Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1088 (8th Cir. 2010) (finding one month too long); Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) ("interval of two months . . . dilutes any inference of causation").  The second protected activity he identifies, his personal-injury report to Sanders on August 8, is closer in time to his receipt of two additional investigation notices on August 13. However, a critical fact weakens any inference to be drawn from the proximity of these

events:  BNSF had served Johnston with the first notice of investigation on August 8,

undisputedly *before* he reported his injury.  "Evidence that [BNSF] had been concerned

about a problem before [Johnston] engaged in the protected activity undercuts the

significance of the temporal proximity."  Smith v. Allen Health Sys., Inc., 302 F.3d 827,

834 (8th Cir. 2002); see also Kuduk, 768 F.3d at 791; Hervey v. Cty. of Koochiching,

527 F.3d 711, 723 (8th Cir. 2008).  Moreover, it is difficult to perceive how the addition

of two charges was "adverse" to Johnston; BNSF concluded, in light of his probationary

status, that his first rule violation alone warranted his termination.  For these reasons, no

jury could find that Johnston's safety or personal-injury report contributed to his

termination.

Johnston next assails BNSF's investigatory process as a "kangaroo court."  (Mem.

in Opp'n 35.)  Indeed, he devotes much of his Memorandum to arguing that he did not in

fact violate the rules and that BNSF's investigation was a biased sham.  But these

arguments are not persuasive.  The Court "decline[s] to review the merits of the

discipline because 'federal courts do not sit as a super-personnel department that re-

examines an employer's disciplinary decisions.'"  Gunderson v. BNSF Ry. Co., 850 F.3d

962, 969 (8th Cir. 2017); see also Kuduk, 768 F.3d at 792 (rejecting plaintiff's argument

that "serious questions exist as to whether . . . BNSF misapplied the fouling-the-track rule

and thus wrongfully discharged him" because plaintiff "is not entitled to FRSA anti-

retaliation relief even if BNSF inaccurately concluded that he committed [misconduct] by

fouling the tracks").  Instead, the "critical inquiry" here is whether BNSF "in good faith

believed that [Johnston] was guilty of the conduct justifying the discharge."  Id.  Thus,

even "employment decisions based on erroneous information" do not evidence retaliation.  Allen v. City of Pocahontas, 340 F.3d 551, 558 n.6 (8th Cir. 2003) (citing Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 957 (8th Cir. 2001)); see also Dafoe v. BNSF Railway Co., 164 F. Supp. 3d 1101, 1113 (D. Minn. 2016) (Tunheim, C.J.) ("[E]ven if BNSF . . . failed to consider certain evidence, or relied on deficient evidence, this conduct, in and of itself, is not unlawful.").  The Eighth Circuit has explained that "if the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity."  Richey v. City of Indep., 540 F.3d 779, 784 (8th Cir. 2008).

In this case, BNSF placed Johnston on probation for one year beginning in April 2013, prior to any relevant protected activity and the (alleged) infractions that led to his discharge.  The PEPA expressly provided that a subsequent Level S violation during this period could result in dismissal.  (See Duginske Decl. Ex. R.)  When BNSF suspected Johnston had committed additional rule violations, it investigated:  it held three hearings at which Johnston enjoyed union representation and the opportunity to testify, call witnesses, and present evidence.  (See Duginske Decl. Exs. FF, GG, HH.)  It is undisputed that during these proceedings, Johnston acknowledged fouling tracks absent preapproval on August 5.  (Id. Ex. FF at 53.)  On these facts, BNSF's conclusion that he misapplied the lone-worker rule does not raise an inference that it terminated his employment due to protected activity.  Kuduk, 768 F.3d at 792.  Similarly, he acknowledged logging overtime hours without Fluck's approval (Duginske Decl. Ex. GG

at 28–29) and falsely recording the method by which he traveled certain tracks (id. Ex. HH at 35). Finally, Jensen and Andrea Smith (a BNSF Labor Relations employee with no prior connection to Johnston) reviewed and affirmed the recommendation to discharge him. Specifically, Andrea Smith conducted an independent review of applicable rules and the investigative hearing transcripts (which included Johnston's testimony) and determined that the circumstances warranted termination of his employment. (A. Smith Dep. 38.) There is no evidence these individuals harbored animus against Johnston for his protected activity. See, e.g., Dafoe, 164 F. Supp. 3d at 1114–15 (BNSF entitled to summary judgment where, *inter alia*, plaintiff failed to show anyone "directly involved in the decision-making process harbored any antagonism or hostility towards him for his protected activity"). In the Court's view, no reasonable jury faced with this evidence could find BNSF lacked a good faith belief that Johnston committed misconduct warranting his discharge. Id. Accordingly, BNSF is entitled to summary judgment on the FRSA claim.

## II.     Johnston's Motion

In addition to his FRSA claim, Johnston seeks relief under FELA, arguing BNSF's negligence—specifically, its failure to equip his hyrail truck with a safety ladder—caused his back injury. FELA affords a cause of action to any railroad employee "suffering injury while he is employed . . . [that] result[s] in whole or in part from the negligence" of the railroad, including injury resulting from "any defect . . . in its cars, engines . . . machinery . . . or other equipment." 45 U.S.C. § 51. Congress enacted FELA in "response to the special needs of railroad workers who are daily exposed to the risks

inherent in railroad work and are helpless to provide adequately for their own safety."

Sinkler v. Mo. Pac. R.R. Co., 356 U.S. 326, 329 (1958).  It thus charges a railroad with

the duty to provide a reasonably safe workplace, e.g., Bailey v. Cent. Vt. Ry., 319 U.S.

350, 352 (1943), and it provides that no "employee shall[] be held to have assumed the

risks of his employment in any case where . . . injury . . . resulted" from the railroad's

negligence, 45 U.S.C. § 54.  To recover under FELA, Johnston must prove that "the

railroad . . . could have reasonably foreseen that a particular condition could cause

injury."  Richardson v. Mo. Pac. R.R. Co., 677 F.2d 663, 665 (8th Cir. 1982).  He now

moves for summary judgment (1) on the causation element of his claim and (2) to

preclude BNSF from asserting contributory negligence or apportioning his damages at

trial.

**A.      Causation**

Johnston asserts that "BNSF has admitted that [his] injury was caused in part by

work" and, as such, causation is undisputed.  (Pl.'s Mem. in Supp. 21.)  In support, he

cites a report prepared by BNSF's expert witness, Dr. Loren Vorlicky, whom he claims

"admitted" that he "suffered some injury at work on August 7, 2013."  (Id.)  To be sure, a

FELA claim "implicates every element of traditional negligence—duty, breach,

foreseeability, causation, and injury."  Richardson, 677 F.2d at 665.  But here, BNSF has

not admitted it caused Johnston's injury, and nowhere in his report does Dr. Vorlicky

purport to do so.  (See Kohn Aff. Ex. X.)  Johnston appears to seize upon Dr. Vorlicky's

imprecise reference to his injury as a "work injury."  Yet, he also describes his "*alleged*

injury" and his "*stated* work injury" and, even absent this qualifying language, the Court

harbors doubt whether he could establish causation.  (Id.)  There is no suggestion that

Dr. Vorlicky has factual knowledge of the cause of Johnston's injury.  Rather, he and all

other medical professionals who have evaluated Johnston may only *opine* as to the cause

of his injury.  Further, a physician's opinion as to the *timing* of an injury is not dispositive

of its cause.  Instead, it will be the jury's task to determine whether Johnston has met his

burden of proving causation.  Accordingly, the Court will deny Johnston's Motion in this

respect.

### B.      Contributory negligence

BNSF seeks to argue at trial that Johnston contributed to his injury by failing to

acquire and install a safety ladder on his hyrail truck.  (E.g., Def.'s Answer to Pl.'s First

Interrogs. 2.)  Johnston responds that FELA precludes this defense, and the Court agrees.

FELA recognizes the affirmative defense of contributory negligence.  E.g., Wilson

v. Burlington N., Inc., 670 F.2d 780, 782 (8th Cir. 1982), cert. denied, 457 U.S. 1120

(1982).  However, in 1939, Congress amended the statute to bar the defense of

assumption of risk and, since then, courts have "fac[ed] the hazy margin between . . .

assumption of risk" and contributory negligence.  Tiller v. Atl. Coast Line R.R. Co., 318

U.S. 54, 58 (1943).  The Eighth Circuit has defined assumption of risk in the FELA

context as "an employee's voluntary, knowledgeable acceptance of a dangerous condition

that is necessary for him to perform his duties. . . .  Contributory negligence, in contrast,

is a careless act or omission on the plaintiff's part tending to add new dangers to

conditions that the employer negligently created or permitted to exist."  Birchem v.

Burlington N. R.R. Co., 812 F.2d 1047, 1049 (8th Cir. 1987) (quoting Taylor v.

Burlington N. R.R. Co., 787 F.2d 1309, 1316 (9th Cir. 1986)) (emphasis omitted). Under these definitions, a railroad employee's use of equipment he knows to be defective, in violation of a general safety rule, is insufficient to submit contributory negligence to the jury. Birchem, 812 F.2d at 1049.

Here, the parties dispute whether Johnston had access to a ladder and approval to have it installed on his hyrail truck, but this dispute is immaterial. Under Birchem, to constitute contributory negligence, Johnston's actions must "tend[] to add new dangers" to conditions created by BNSF's alleged negligence.[5] Id. His failure to equip BNSF's hyrail truck with a ladder added no new dangers, and BNSF does not argue he was negligent in any other way. He simply maintained the status quo, continuing to use an allegedly unsafe, BNSF-owned hyrail truck. In the Court's view, this is insufficient to instruct the jury on contributory negligence. Indeed, it is BNSF's duty to provide Johnston a reasonably safe place to work. Bailey, 319 U.S. at 352. To allow a contributory negligence defense on these facts would effectively shift BNSF's burden to Johnston, rendering him partially liable for failing to remedy an allegedly dangerous condition he took no part in creating. And though he continued to use his purportedly unsafe hyrail truck, he cannot be held liable for "accepting a dangerous condition that is necessary for him to perform his duties." Birchem, 812 F.2d at 1049. Accordingly, the Court will preclude BNSF's contributory-negligence defense.

## C.    Apportionment of damages

Johnston lastly argues that if BNSF is found liable at trial, the Court should

---

[5] To be clear, the Court expresses no view whether BNSF was negligent.

preclude it from asking the jury to apportion his damages between prior back injuries and his alleged August 7 work injury. As an initial matter, Johnston asserts that BNSF failed to plead this defense. (Pl.'s Mem. in Supp. 22.) He is incorrect; BNSF alleged in its Answer that "[p]reexisting conditions or other contributory or concurrent conditions, including events occurring prior or subsequent to the incident upon which [Johnston] bases his claims, caused his injuries or damages." (Answer ¶ 36.) He next argues that BNSF submitted no evidence to sustain this defense. Again, he is incorrect; Dr. Vorlicky examined Johnston and reviewed his medical history. (Kohn Aff. Ex. X.) This led her to opine that Johnston's purported August 7 injury "was nothing more than a temporary aggravation of [his] preexisting condition, with the preexisting condition being multilevel degenerative disc disease of the lumbar spine." (Id.) She added her opinion that "he had activity-related low back pain prior to the work injury of August 7, 2013." (Id.) From her testimony, a jury could reasonably apportion Johnston's damages. True, Dr. Vorlicky's report does not set forth any *degree* of apportionment, but "[a]pportionment can be proved without expert testimony stating the percentage of injury attributable to the different causes." Sauer v. Burlington N. R.R. Co., 106 F.3d 1490, 1494 (10th Cir. 1996). Indeed, "when there is evidence that defendant's negligence aggravated a preexisting condition but expert testimony does not precisely apportion the injury, apportionment is an issue for the jury." Id. In addition, BNSF points out that, in 2006, Johnston settled a claim of a work-related back injury in exchange for a written release of future claims (Def.'s Mem. in Opp'n 19), yet another reason to put apportionment before the jury. For these reasons, the Court will permit BNSF's

apportionment defense.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Johnston's Motion for Partial Summary Judgment (Doc. No. 47) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** to the extent Johnston argues BNSF cannot raise a contributory-negligence defense at trial. In all other respects, the Motion is **DENIED**. BNSF's Motion for Partial Summary Judgment (Doc. No. 49) is **GRANTED,** and Count II of Johnston's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.[6]

Jury trial in this matter will begin on September 25, 2017. Prior to trial, the parties will have an opportunity to discuss settlement before Magistrate Judge Rau. Despite dismissal of Johnston's FRSA claim, trial in this matter is likely to be lengthy and expensive and, as such, the Court believes that this matter is ripe for settlement.

Date: June 30, 2017                                         s/ Richard H. Kyle
                                                            RICHARD H. KYLE
                                                            United States District Judge

---

[6] In light of this disposition, the Court need not and does not reach BNSF's Motion to Bifurcate.