UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jason Johnston,

          Plaintiff,

v.

BNSF Railway Company,

          Defendant.

Civ. No. 15-3685 (SRN/KMM)

**MEMORANDUM OPINION AND ORDER**

---

Kathryn Kohn Troldahl, Kohn Law, PA, Minneapolis, Minnesota, Jon M. Moyers, Moyers Law, PC, Billings, Montana, for Plaintiff.

Timothy R. Thornton, Tara Reese Duginske, Briggs and Morgan, PA, Minneapolis, Minnesota, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Plaintiff Jason Johnston's Motion to Reconsider (Doc. No. 82), in which he seeks reconsideration of Judge Richard H. Kyle's June 30, 2017 Order (Doc. No. 75, the "June 30 Order") on the parties' cross-Motions for Partial Summary Judgment. Specifically, Johnston asks the Court to reconsider that portion of the June 30 Order granting the Motion of Defendant BNSF Railway Company ("BNSF") and dismissing his claim under the Federal Railroad Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20109. For the reasons that follow, Johnston's Motion will be granted.

## II. BACKGROUND

### A. Facts[1]

#### 1. Johnston's reports and the alleged rule violations

On May 14, 2013, Johnston's Union, the Brotherhood of Maintenance of Way Employees ("BMWE"), lodged a complaint against BNSF with the Federal Railroad Administration ("FRA") based on safety concerns reported by Johnston. (Duginske Decl. Ex. VV.)[2] It prompted an investigation, which determined:

> [BNSF's] inspection records were in order according to [federal standards]. However, three locations inspected contained defects that had been documented as repaired which had not been remedied. As a result, a recommendation for the assessment of civil penalties will be submitted to the FRA Office of Chief Counsel.

(Id. Ex. WW.) Following the investigation, BNSF verbally reprimanded Johnston's supervisor, Roadmaster Larry Sanders, and noted "needs improvement" on his performance review because of the FRA's findings. (T. Smith Dep. at 131-32.)

The FRA later performed a follow-up inspection and identified track defects at BNSF's Milbank yard (a location in Johnston's territory) that were required to be repaired within thirty days. (Johnston Dep. at 89, 95.) Johnston e-mailed Sanders daily to remind him of the defects but, thirty days later, the repairs had not been completed. (Id. at 96.) As a result, Johnston decided to "pull the yard out of service" on July 19.

---

[1] The Court recites here much of the background leading up to the June 30 Order, but it will not be repeated in its entirety. The entire factual background recited in the June 30 Order is incorporated herein. As is appropriate, all facts are considered in a light most favorable to Johnston.

[2] All exhibits and deposition transcripts cited herein were part of the summary-judgment record.

(Id.)  According to Johnston, Roadmaster Joshua Fluck (who was supervising him at the time) responded by calling and informing him that his "ass would be grass" for making this decision.  (Id. at 36.)

Approximately two weeks later, on August 4, 2013, BNSF's Maintenance of Way ("MOW") Department called Fluck shortly before midnight with a report of "rough tracks."  (Fluck Dep. at 55-59; Duginske Decl. Ex. FF at 11.)  Fluck sent Johnston to inspect and take any necessary safety precautions.  (Fluck Dep. at 59; Johnston Dep. at 115.)  Johnston traveled to the location, took measurements, and at approximately 2:45 am on August 5, "slow ordered" the tracks to ten miles per hour.  (Duginske Decl. Exs. AA, FF at 11.)  After completing this work, he proceeded to inspect other tracks in his territory, including an area known as "Big Stone," and reported these hours as overtime.  (Id. Ex. GG at 10, 14.)

Later that morning, Fluck participated in a conference call with Sanders and Division Engineer Tom Smith (Sanders's and Fluck's boss).  Fluck informed them of the rough-track call and Johnston's response, but Smith noted he had not received Johnston's "track notes," a form upon which train inspectors document track measurements.  (T. Smith Dep. at 41-43.)  He asked Fluck to follow-up to determine whether Johnston had in fact inspected the track and prepared the notes.  (Id. at 41-46.)

As he was inquiring whether Johnston had completed the inspection, Fluck noticed there was no indication Johnston had obtained approval to "foul the tracks" at the

location of the rough-track report. (Id. at 46.)³ This led Smith to conclude the section of rough tracks either "wasn't inspected or . . . wasn't inspected . . . safely," and he decided to initiate an investigation as provided by the collective-bargaining agreement (the "CBA") between BNSF and the BMWE. (Id. at 46, 54.) He drafted a letter informing Johnston of an investigation to determine whether he had "fail[ed] to properly obtain authority before occupying or fouling the main track when [he] responded to a rough track [call] . . . on August 5, 2013." (Duginske Decl. Ex. BB.) The letter also provided that Johnston was "being withheld from service pending results of [the] investigation." (Id.) Smith directed Sanders to hand-deliver this letter to Johnston at his home. (T. Smith Dep. at 60.)

In the interim, on August 7, Johnston engaged in strenuous work for the railroad. (Johnston Dep. at 72.) The following morning, he awoke with severe back pain, which he attributed to his work the previous day. (Johnston Dep. at 73-75.) As he was leaving home to report to BNSF, Sanders and another railroad employee arrived. (Id.) Sanders handed Johnston an envelope containing Smith's notice of investigation and said, "We're pulling you out of service." (Id.) Johnston "could not believe it" and was "beside [him]self," and for "several minutes" he blocked everything out. (Id. at 73-76.) He then told Sanders: "[W]ell, that's fine . . . but we need to do some paperwork, because . . . I cannot hardly walk, I can't move, I can't tie my shoes, I have to go see the doctor." (Id.) According to Johnston, Sanders ignored this report and drove away. (Id.)

---

³ "Fouling the tracks" means to occupy railroad tracks without preapproval from central train dispatch.

Meanwhile, Smith continued to review Johnston's August 5 conduct. (T. Smith Dep. at 53.) In doing so, he came to believe Johnston had committed two additional rule violations: first, following the rough-track call, Johnston continued to work and reported those hours as overtime when he did not have supervisor approval to do so; and second, Johnston reported that he had traversed the Big Stone track by "hyrail" truck (a truck capable of driving on and off railroad tracks), but there was no record of him obtaining preapproval to foul the tracks. (Id. at 50-54.) Smith decided to initiate an investigation into these violations as well, and he so notified Johnston by two letters dated August 13. (Duginske Decl. Exs. II, JJ.) The letters stated that "BNSF received first knowledge of [these] alleged violation[s] [on] August 8, 2013." (Id.)

### 2. The BNSF hearings

In late August 2013, BNSF held three separate hearings (called "investigations" by the parties) concerning each of Johnston's purported rule violations. (Id. Exs. FF-HH.) The investigations were conducted by Jason Randash, a BNSF Roadmaster based in Fargo, North Dakota. (Id.) Johnston represented himself, accompanied by representatives from the BMWE. (Id.) Fluck testified at the first investigation (concerning the initial fouling-the-tracks allegation); Fluck and Sanders testified at the second investigation (regarding the allegedly unauthorized overtime); and Sanders testified at the third investigation (regarding the fouling-the-tracks allegation at Big Stone). (Id.)

At the first investigation, Fluck testified that under BNSF's rules, Johnston was required to obtain preapproval to foul the tracks because he was working at night, but

there was no evidence he had done so. (Id. Ex. FF at 12-13.) Johnston responded that he had used the "lone-worker rule," pursuant to which a single worker may foul tracks without preapproval when he is able to "visually detect the approach of a train . . . and position [himself] in a predetermined place of safety at least 15 seconds prior to the arrival of the train." (Id. Ex. Z at 7.) The rule requires that "natural or artificial light and conditions [be] sufficient to observe approaching trains," and its use may not be based "solely upon the observation of [a train's] headlights, . . . such as during conditions of insufficient visibility as affected by darkness or inclement weather." (Id.) Johnston contended that there was sufficient moonlight and artificial lighting to invoke the rule during the early-morning hours on August 5, and he submitted written statements from four other railroad employees indicating they had used the lone-worker rule at night without ramifications. (Duginske Aff. Ex. FF at 32-35.)

At the second investigation, conducted in the morning on August 18, 2013, Sanders testified that overtime must be approved by a supervisor, and that he learned on August 8 that Johnston had worked unapproved overtime following the rough-track call on August 5. (Id. Ex. GG at 11-20.) Fluck similarly testified that he did not authorize Johnston to work overtime on August 5. (Id. at 23-24.) In response, Johnston raised two procedural objections: first, that the assertion of unauthorized overtime was untimely under the CBA,[4] and second, that Sanders and Fluck had met privately with Randash

---

[4] The CBA provides that an investigation must be held "within ten days after the date [the employee is] withheld from service." (Doc. No. 76-1 at 7; see also Duginske Decl. Ex. GG at 5-6.) As previously noted, Johnston was withheld from service on August 7, and the investigation regarding overtime was held on August 18. (Duginske Decl. Ex. GG at 1.)

- 6 -

before the investigation commenced, which undermined its impartiality. (Id. at 5-6.) On the merits, he testified that Sanders previously had advised him that given the size of his territory, Johnston was authorized to work overtime whenever necessary to complete his duties. (Id. at 40; Johnston Dep. at 27.)

At the third investigation (conducted in the afternoon on August 18), Sanders testified that Johnston's track notes from August 5 indicated he had inspected Big Stone using a hyrail truck, but there was no record of him having received preapproval to do so. (Duginske Decl. Ex. HH at 10-11.) Johnston responded by first renewing his objection to the impartiality of the hearing. (Id. at 6-7.) He then testified that while he had driven *to* Big Stone by hyrail truck on August 5, he had actually *walked along the side of the tracks* in that area when performing his inspections and therefore required no preapproval, since he did not actually foul the tracks. (Id. at 17, 26, 30, 39.) When BNSF confronted him with his track notes, on which he had reported traveling through the area by hyrail, Johnston responded that the form, which is computerized, left no way for him to report both that he had driven *to the area* in a hyrail truck but then *walked* the area afterwards. (Id. at 33-34.)

Following the investigations, Smith determined that the evidence supported all three charged rule violations, and he concluded BNSF should terminate Johnston's employment. (T. Smith. Dep. at 56-57.) He forwarded that recommendation to Douglas Jensen, the General Director of Line Maintenance for Johnston's area, and, after reviewing investigation documents, Jensen concurred. (Id.; Jensen Dep. at 143, 168.) The railroad then forwarded the recommendation to Andrea Smith, a Labor Relations

employee at its headquarters in Texas, whose role is to review dismissal decisions. (A. Smith Dep. at 7.) She also reviewed the evidence, including transcripts of the investigations conducted by Randash, and noted that Johnston was on probation for an earlier rule violation when he committed the alleged misconduct in August 2013. (Id. at 38-39, 89-90.) Based on her review, she agreed with the recommendation and concluded that the circumstances justified Johnston's discharge. (Duginske Decl. Ex. PP.)

BNSF terminated Johnston's employment via three letters dated September 12, 2013 – one for each alleged rule violation. (Id. Ex. QQ.) All were signed by Randash and concluded that Johnston had committed each of the violations charged. (Id.)

### B. The prior proceedings

Johnston commenced this action against BNSF on September 18, 2015. As pertinent here, his Complaint alleged that BNSF violated the FRSA by terminating his employment in retaliation for (1) the report to the FRA and his subsequent decision to remove the Milbank yard from service on July 19, 2013, and (2) his report of a workplace injury on August 7, 2013. Simultaneously, Johnston – through his union – grieved his termination in accordance with the CBA, eventually reaching the National Railroad Adjustment Board ("Board").[5]

---

[5] The Board was created as part of the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, and has "jurisdiction over disputes involving . . . maintenance-of-way men" such as Johnston and the railroads employing them, id. § 153(h)-(i). While an employee generally may not seek protection under the FRSA and "another provision of law for the same allegedly unlawful act of [a] railroad carrier," 49 U.S.C. § 20109(f), courts have held that an employee seeking relief from the Board pursuant to grievance procedures established by a collective-bargaining agreement does not run afoul of § 20109(f). See, e.g., Reed v. Norfolk S. Ry. Co., 740 F.3d 420, 423 (7th Cir. 2014) (collecting cases).

1.  **This litigation**

Here, the parties undertook extensive discovery and then cross-moved for partial summary judgment; BNSF sought dismissal of the FRSA claim, contending Johnston could not show it had engaged in retaliation. In particular, it pointed to the August 2013 investigations and argued it had a good-faith belief Johnston had committed the charged rule violations. (See Doc. No. 50 at 15-21, 29-31 (arguing that when an "employer takes an adverse action based on good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not [in retaliation for] protected . . . activity").) Johnston responded that the evidence did not support any of the alleged charges, and accordingly there was a genuine issue whether BNSF lacked a good-faith belief he had violated workplace rules. (Doc. No. 58 at 31-37.)

In the June 30 Order, Judge Kyle agreed with BNSF and concluded "no reasonable jury . . . could find that BNSF lacked a good faith belief that Johnston committed . . . misconduct[,] warranting his discharge." (June 30 Order at 18.) The Order noted that Johnston was on probation when BNSF charged him with malfeasance in August 2013, and it then conducted three investigations before imposing discipline. (Id. at 17.) It also noted that at those investigations, Johnston (1) admitted fouling the tracks in the early morning hours on August 5, 2013, and BNSF's conclusion (whether correct or incorrect) that he had improperly used the lone-worker rule did not suggest retaliation; (2) admitted working overtime without Fluck's approval; and (3) acknowledged he did not accurately record in his track notes that he had walked the tracks at Big Stone, which would justify his discharge even if he did not actually foul the tracks (as he argued). (Id. at 17-18.)

Recognizing that a "federal court[] do[es] not sit as a super-personnel department that re-examines an employer's disciplinary decisions" (id. at 16), the June 30 Order concluded that Johnston had failed to create a genuine issue for trial.

### 2. The grievance proceedings

Meanwhile, as this lawsuit was progressing, the grievance process, too, was advancing; it remained pending all the way through the hearing on the parties' summary-judgment motions. Unbeknownst to the Court (or counsel), however, three days before the June 30 Order issued, the Board sustained Johnston's challenge to his termination, rescinded his discharge, and ordered him reinstated with back pay and no loss of seniority. The Board set forth its findings in an 11-page order and award (Doc. No. 76-1 (the "Board's Order")), concluding:

- *First*, as to the fouling-the-tracks violation in the early morning on August 5, 2013, BNSF's rejection of Johnston's use of the lone-worker rule was "highly questionable," as the rule nowhere stated it could not be used at night. Indeed, Johnston submitted statements from other employees indicating they often used the rule at night, and those statements were "not challenged" by BNSF. Furthermore, Fluck (BNSF's lone witness as to this violation) had no way of knowing the lighting conditions present on August 5, as he was not at the location of the rough-track call, and there was "no testimony that any [BNSF] officer took the . . . trouble to view the site under approximately the same (or any) conditions as existed early on August 5, 2013." Simply put, BNSF "for all practical purposes ignored [Johnston's] testimony simply because [he] worked at night and ignored evidence that several other workers had used [the] Lone Worker [rule] apparently without being disciplined as a result." (Id. at 6-7.)

- *Second*, as to the alleged unauthorized overtime, the evidence did not support BNSF's contention that it first learned of the issue on August 8, 2013. Rather, Sanders's and Fluck's own testimony showed that they were aware on August 5 that Johnston had worked overtime in violation of railroad rules, and hence BNSF's allegation was untimely under the CBA. (Id. at 7-9.)

- 10 -

- *Third,* as to the alleged Big Stone fouling-the-tracks violation, Johnston did not receive a fair and impartial hearing because Sanders and Fluck met with Randash in advance of the August 18 investigation. While the contents of the conversation between them was unknown, Randash's "participation in such a discussion breaches impartiality," because it created "the *appearance* of bias" in the hearing process. (Id. at 9-10 (emphasis added).)

### C. The instant Motion

In light of the Board's Order, Johnston now moves to reconsider the dismissal of his FRSA claim. He argues the reasoning in the Board's Order calls into question the conclusion that no reasonable jury could find BNSF lacked a good-faith belief he had engaged in misconduct. BNSF responds that the Board's Order does nothing to move the needle, because it made no actual findings that the railroad had in fact retaliated against Johnston. Johnston's Motion has been fully briefed, and the Court held a hearing on August 22, 2017, after which it requested additional briefing. With that briefing having been submitted, Johnston's Motion is now ripe for disposition.

## III. DISCUSSION

### A. Standard of review

Motions for reconsideration are "not described in the Federal Rules of Civil Procedure," but such motions are common and are treated "either as [] Rule 59(e) motion[s] to alter or amend the judgment or as [] Rule 60(b) motion[s] for relief from judgment." Peterson v. Travelers Indem. Co., 867 F.3d 992, 997 (8th Cir. 2017). This Court's Local Rules authorize a party to move for reconsideration after obtaining leave,

upon a showing of "compelling circumstances." D. Minn. LR 7.1(j).[6] As Johnston calls into question the propriety of a non-final order, his Motion is properly construed under Rule 60(b). E.g., Broadway v. Norris, 193 F.3d 987, 990 (8th Cir. 1999) (noting that motions under Rule 59(e) are directed only to *judgments*, "not any non[-]final order," and hence a motion for reconsideration directed to a non-final order should be considered under Rule 60(b), which by its terms applies to both judgments *and* orders); see also Elder-Keep v. Aksamit, 460 F.3d 979, 984 (8th Cir. 2006) ("[M]otions for reconsideration are nothing more than Rule 60(b) motions when directed at non-final orders.") (internal quotation marks and citation omitted).

Rule 60(b) authorizes a court to revisit an order based upon newly discovered evidence. Fed. R. Civ. P 60(b)(2). A party bringing such a motion must satisfy "stringent standards," United States v. Mask of Ka-Nefer-Nefer, 752 F.3d 737, 743 (8th Cir. 2014), as Rule 60 "provides for extraordinary relief which may be granted only upon an adequate showing of exceptional circumstances," Kaler v. Slominski (In re Keeley & Grabanski Land P'Ship), 832 F.3d 853, 858 (8th Cir. 2016) (citation omitted). The movant bears the burden of showing that the new evidence's consideration would produce a different result. E.g., In re Levaquin Prods. Liab. Litig., 739 F.3d 401, 404 (8th Cir. 2014) (quoting Schwieger v. Farm Bureau Ins. Co. of Neb., 207 F.3d 480, 487 (8th Cir. 2000)).[7]

---

[6] The Court granted Johnston leave on July 18, 2017. (See Doc. No. 78.)

[7] The Court recognizes the unique posture of the instant Motion. As noted at the hearing, this matter was reassigned as a result of Judge Kyle taking medical leave, and the undersigned

B.  Mootness

At the hearing, the Court first questioned whether Johnston's FRSA claim is moot in light of the Board's Order, which awarded him back pay, reinstatement, restoration of seniority, and reimbursement for medical expenses.  At the time, Johnston argued the claim was not moot even if the Board's Order made him whole, because he continued to maintain a claim for punitive damages.  Such damages, he argued, "automatically" became ripe if a jury were to find the FRSA had been violated.

This argument misses the mark.  Barely two months ago, the Eighth Circuit recognized that an FRSA plaintiff seeking punitive damages bears a "formidable burden," and even if he can show retaliation, the defendant can avoid such damages by showing it made good-faith efforts to comply with the FRSA.  BNSF Ry. Co. v. U.S. Dep't of Labor Admin. Review Bd., 867 F.3d 942, 947 (8th Cir. 2017) (citations omitted).  Hence, it does not "automatically" follow that punitive damages become a jury question any time a plaintiff can show retaliation under the FRSA.

Nevertheless, the Court concludes the FRSA claim is not moot.  Honing his argument in response to the Court's request for supplemental briefing, Johnston notes that his Complaint requested damages for emotional distress as a result of BNSF's conduct.  (Compl. ¶ 80(d).)  It is clear such damages are available under the FRSA, see, e.g., Blackorby v. BNSF Ry. Co., 849 F.3d 716, 723 (8th Cir. 2017), and the Board's

---

remains mindful that the instant Motion is not an appeal of the June 30 Order. Nevertheless, that Order remains subject to amendment, see Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claims . . . does not end the action . . . and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

Order nowhere addresses them. Accordingly, there remains relief that could be awarded on the FRSA claim, and hence it is not moot. See, e.g., Campbell-Ewald Co. v. Gomez, __ U.S. __, 136 S. Ct. 663, 669 (2016) (claim becomes moot when "it is impossible for a court to grant any effectual relief whatever to the prevailing party") (citation omitted).

### C. Reconsideration

To survive summary judgment on an FRSA retaliation claim, a plaintiff must proffer sufficient evidence to create a genuine issue that (1) he engaged in protected activity, (2) the employer knew he engaged in protected activity, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference that the protected activity was a contributing factor in the employer's action. Kuduk v. BNSF Ry. Co., 768 F.3d 786, 789 (8th Cir. 2014). The June 30 Order recognized that BNSF had conceded the first three prongs of this test, but it determined that Johnston failed on the fourth prong because no reasonable jury could conclude BNSF lacked a good-faith belief he had committed misconduct. In other words, the record did not create a genuine issue that Johnston's reports of safety concerns or his complaint of a workplace injury contributed to his discharge, rather than BNSF's belief he had violated its rules.

In the Court's view, however, the Board's Order constitutes new evidence that substantially changes the calculus and entitles him to relief under Rule 60(b). Indeed, the Board's conclusions regarding each of Johnston's three ostensible rule violations call into question whether BNSF acted based on a good-faith belief he had committed misconduct. Thus, they create a triable issue whether, in actuality, the railroad retaliated against him. Loos v. BNSF Ry. Co., 865 F.3d 1106, 1112 (8th Cir. 2017) (FRSA plaintiff must only

create a genuine issue that protected activity contributed to discharge; "the employee need not conclusively demonstrate the employer's retaliatory motive").

Take, for example, the first August 5 fouling-the-tracks allegation. The Board's Order made clear that BNSF ignored, without explanation, at least four written statements from Johnston's co-workers indicating they had used the lone-worker rule at night without challenge and without suffering any consequences. (See Board's Order at 6.)[8] Johnston, by contrast, was discharged for the same conduct. These facts could indicate to a reasonable jury that the railroad had engaged in retaliation. Indeed, "inconsistent application" of an employer's rules is an "indication[] of pretext" that can "raise an inference of retaliatory motive." Loos, 865 F.3d at 1112. Moreover, the facts reasonably could be read to suggest Johnston did not, in fact, violate a railroad rule. When determining if the circumstances suggest retaliation, the Court must examine "the evidence of the employer's [proffered] nonretaliatory reasons," Gunderson v. BNSF Ry. Co., 850 F.3d 962, 969 (8th Cir. 2017) (citation omitted), and if the evidence suggests those reasons are "unworthy of credence," then "intentional discrimination may be inferred," BNSF Ry. Co., 867 F.3d at 947 (citations omitted). That is the case here.[9]

---

[8] At summary judgment, BNSF assailed the co-worker statements, arguing that no declarant testified and thus it had no opportunity to cross-examine them. (See Doc. No. 50 at 16.) But it could have called its own witnesses to testify about the lone-worker rule at the investigation, and there is no evidence it attempted to depose the declarants as part of *this* litigation.

[9] To be sure, BNSF correctly notes it cannot be liable simply by having "misapplied the fouling-the-track rule" or "inaccurately conclud[ing]" that Johnston committed misconduct. Kuduk, 768 F.3d at 792. But the circumstances here suggest more than a "misapplication" of the rule. As in Wagner v. Grand Trunk Western Railroad, a jury "could find that [BNSF] knew [Johnston] did not violate the rule but was so miffed by his . . . report[s] that it [fired] him and then tried to hide behind the rule." No. 15-10635, 2017 WL 733279, at *7 (E.D. Mich. Feb. 24, 2017).

The Board's Order also rescinded Johnston's discharge for working unauthorized overtime, as that assertion was untimely under the CBA. This conclusion is important for two reasons. First, by pressing an untimely rule violation, BNSF flouted the very procedures it agreed to in the CBA. This is suggestive of pretext and bad faith. See, e.g., Jauhola v. Wis. Cent., Ltd., Civ. No. 14-1433, 2015 WL 4992392, at *7 (D. Minn. Aug. 20, 2015) (Kyle, J.). Second, as noted above, when Johnston was withheld from service, BNSF advised him that it "received first knowledge of th[e] alleged [overtime] violation [on] August 8, 2013." (Duginske Decl. Ex. II.) Fluck and Sanders testified consistently at the August 18 investigation, claiming they were unaware Johnston had worked unauthorized overtime until August 8, 2013. Yet, the Board's Order determined these assertions were simply untrue. The Board found that the record conclusively established Fluck knew as of *August 5* that Johnston had (allegedly) violated overtime rules, and it strongly suggested that Sanders knew it as of that date, too. (Board's Order at 8.) A jury could infer a retaliatory motive from this (alleged) lack of candor and failure to adhere to company policy. See BNSF Ry. Co., 867 F.3d at 947.

Next, the June 30 Order determined that even if Fluck or Sanders harbored retaliatory animus – hardly a stretch given the record[10] – the FRSA claim still failed because neither of these individuals made the decision to terminate Johnston's employment. (June 30 Order at 14-15.) BNSF clings to that logic here, arguing the

---

[10] Facts from which retaliatory animus could be inferred include (1) Fluck's "ass would be grass" comment, (2) Sanders having been reprimanded as a result of Johnston's complaints to the FRA, and (3) Sanders ignoring Johnston's report of a workplace injury, and Johnston being charged with additional rule violations shortly thereafter.

Board's Order "does not change the fact that Fluck and Sanders – who supposedly were out to get Johnston – had nothing to do with his discharge." (Doc. No. 86 at 4.)

But as the Board's Order makes clear, Fluck and Sanders were not simply idle participants in the events culminating in Johnston's termination. Rather, they were the *only* witnesses who testified against him at the August 2013 investigations, which ostensibly supplied the bases for his discharge. And that testimony included, among other things, Fluck's "highly questionable" interpretation of the lone-worker rule, a mere month after threatening Johnston that his "ass would be grass," and arguably untruthful testimony regarding the overtime allegation.

Hence, this is a case unlike Gunderson, where the supposedly hostile employees were "trivial participants" in the termination process. 850 F.3d at 970. Rather, Fluck and Sanders were intimately involved in that process, and their alleged discriminatory animus is not so easily cast aside. This is precisely why the Board's Order sustained Johnston's challenge regarding Big Stone, as two allegedly biased witnesses meeting with Randash (the hearing offer) in advance of the investigation could easily create an appearance that "the fix was in." (Board's Order at 10.) And, although Tom Smith, Jensen, and Andrea Smith were the ultimate decision-makers, there is no suggestion they did anything other than review what Fluck and Sanders had alleged against Johnston and testified to at the investigations. See Ludlow v. BNSF Ry. Co., 788 F.3d 794, 802 (8th Cir. 2015) (affirming jury verdict for plaintiff on retaliation claim under "cat's paw" theory where hostile employees provided the only information to the decision-maker, who did not conduct his own investigation).

For all of these reasons, the Board's Order creates a paradigm shift in the analysis. As the record now stands, there exists evidence from which a reasonable jury could conclude: 1) BNSF charged Johnston with a rule violation shortly after he engaged in protected conduct, then charged him with additional violations immediately after reporting a workplace injury; 2) the railroad violated procedures set forth in the CBA when investigating the alleged violations; 3) a supervisor harboring animus (Fluck) interpreted BNSF rules in a questionable fashion against Johnston, in the process ignoring evidence from Johnston's co-workers undermining the supervisor's interpretation; 4) two supervisors (Fluck and Sanders) harboring animus against Johnston met *ex parte* with the hearing officer tasked with determining whether Johnston had violated workplace rules; and 5) those same two supervisors offered allegedly false testimony (about overtime) during the investigations in order to press an untimely charge of misconduct. Considering this evidence in its entirety, the Court concludes a reasonable jury could find BNSF retaliated against Johnston when it terminated his employment. See Loos, 865 F.3d at 1112-13; Dafoe v. BNSF Ry. Co., 164 F. Supp. 3d 1101, 1109 (D. Minn. 2016) (Tunheim, C.J.). Accordingly, the FRSA claim must proceed to trial.[11]

---

[11] When an employee such as Johnston establishes a *prima facie* case of FRSA retaliation, a railroad may still avoid liability if it shows "by clear and convincing evidence that [it] would have taken the same unfavorable personnel action in the absence of" protected activity. Kuduk, 768 F.3d at 789. BNSF tries to do so here but in support relies largely on the same arguments it asserted at summary judgment, which have been significantly undermined by the Board's Order. In any event, this "same decision" defense generally is "not suitable for summary judgment determination," id. at 793, and the evidence establishing a *prima facie* case of retaliation here is sufficient to call into doubt whether BNSF would have terminated Johnston's employment absent retaliation. See, e.g., Dafoe, 164 F. Supp. 3d at 1115-16 (noting that courts consider

Finally, as a result of the foregoing, BNSF's request for separate trials is once again ripe.[12] BNSF argues that Johnston's FRSA claim is "more complicated" than and "do[es] not overlap" with his claim under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, and that presenting them together to one jury will "complicate the proceedings, create jury confusion, and inject undue prejudice into a relatively simple FELA action." (Doc. No. 50 at 38-39.) But the Court believes these concerns can be addressed by careful cautionary instructions to the jury. Furthermore, while the Court enjoys the discretion to order separate trials, Fed. R. Civ. P. 42(b), they are the exception, not the rule, since "a single trial generally tends to lessen the delay, expense, and inconvenience to all concerned." Cedarapids, Inc. v. CMI Corp., No. C98-0110, 1999 WL 33656876, at *1 (N.D. Iowa Oct. 26, 1999) (Melloy, J.). As it appears the witnesses for the two claims overlap to some degree, it would conserve resources for the parties (and the court) and avoid inconvenience to try the two claims together. Bifurcation will accordingly be denied.

## IV. CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**, pursuant to Federal Rules of Civil Procedure 54(b) and 60(b), that Johnston's Motion to Reconsider (Doc. No. 80) is **GRANTED**. **IT IS FURTHER**

---

many of the same factors for a *prima facie* case and a "same decision" defense, including "whether the railroad followed applicable investigatory and disciplinary procedures," the "temporal proximity between the non-protected conduct and the adverse actions," and "whether the railroad consistently enforces the policies and rules at issue").

[12] The June 30 Order had denied this portion of BNSF's Motion because it was moot following dismissal of the FRSA claim.

**ORDERED** that the portion of the June 30 Order (Doc. No. 75) granting BNSF's Motion for Partial Summary Judgment and dismissing Johnston's FRSA claim is **VACATED**, and BNSF's Motion for Partial Summary Judgment (Doc. No. 49) is **DENIED** in its entirety.


Dated: October 16, 2017          s/Susan Richard Nelson
                                 SUSAN RICHARD NELSON
                                 United States District Judge